UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 1:22-cv-10767-DPW

**JAMES JULSONNET and DIANE JULSONNET**
Plaintiffs
v.

**TOPHILLS, INC.,** *et al.*
Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs James and Diane Julsonnet, by and through counsel, and respectfully request that the court deny the Defendants' motion for summary judgment. Numerous disputed issues of material fact remain that must be tried by the jury.

**Summary of Argument**

The Carmack Amendment preemption that Defendants rely upon does not apply to the Plaintiffs' state law-based claims as they are unrelated to claims for goods damaged in interstate transit. Here the Defendants violated federal law governing contracts for moving goods (see 49 CFR 375, Federal Motor Carrier Administration, § 375.403), and conducted a bait and switch regarding the terms of the moving contract with Plaintiffs, forged Plaintiffs' name on alleged revised contract documents, and then held their goods hostage under the pretense of the forged documents, demanding payment of monies twice the amount actually contracted for. These types of claims are not preempted by Carmack.

**Material Facts At Issue**

James Julsonnet entered into a binding estimate for Defendant movers to move Diane Julsonnet's business inventory and their household goods from Massachusetts to Colorado. **Exs.**

**A & B James Julsonnet Interrogatory Answers # 12; Ex. C & D Diane Julsonnet Answers to Interrogatory 6.** Diane's business consists of selling clothes and other personal items on the internet, with inventory obtained through buying out merchandise from other vendors. **Ex. F Diane Julsonnet Dep. 41:1 to 46:18.** Under Federal law and regulations, this binding estimate (Document 38-1) is the binding contract under which Defendants were obligated to move and deliver the Julsonnet's goods. 49 CFR § 375.403(a)(6)(ii), (7), (8).

Mrs. Julsonnet's business inventory and the Julsonnets' goods were valued at $142,800.00, as stated in the contract. Document 38-1 page 7 of 8. **Ex. I, James Julsonnet Aff. ¶ 4.** Diane testified that her inventory was valued at over $100,000, **Ex. F Diane Julsonnet Dep. 41:7 to 42:8,** and that her business had generated $40,000 a year. **Ex. F 46:5-18.** The price for the move was $26,998.61. James paid the 25% deposit of $5996.61, placing it on his credit card, leaving a balance of $21,000.00. The contract called for pick-up on September 12, and 13, 2021. The movers were to arrive on Sunday September 12, 2021. Document 38-1 page 2 of 8.

Instead of arriving on September 12, 2021, the movers called on Friday September 10, 2021, and stated they would begin the pickup one day early, on September 11, 2021. **Ex. E James Julsonnet Dep. 37:15-39:13; Ex. F Diane Julsonnet Dep. 6:19-25.** When the movers did arrive on September 11, 2021, it was Five Star Movers, and not Febex. **Ex. E James Julsonnet Dep. 54:15-18, 93:14-23; Ex. F Diane Julsonnet Dep. 15:1-5.** In addition, the Foreman for Five Star demanded that the Julsonnets sign a new bill of lading, mostly blank, before they started to load the truck. **Exs. A & B James Julsonnet Interrogatory Answer #3; Ex. F Diane Julsonnet Dep. 11:12 to 14:25.** The Julsonnets refused to sign a blank document. **Ex. E James Julsonnet Dep. 46:1-9, Ex. F Diane Julsonnet Dep. 11:18-22.** The movers also demanded that the Julsonnets agree to pay for boxes and other moving items. **Ex. F Diane**

**Julsonnet Dep. 11:18-22, 12:10-14, 13:21-14:6.** The Julsonnets again refused, as they had been boxing their materials. **Ex. F Diane Julsonnet Dep. 7:16 to 8:7.** Mr. Julsonnet did agree to pay for any boxes they used, but on the condition that the movers get his approval for the use of the boxes before they were used. **Ex. F Diane Julsonnet Dep. 13:13 to 14: 25.** The document was signed by Mr. Julsonnet with that condition added. **Ex. E James Julsonnet Dep. 52:19-53:12.**

Under the contract's terms of payment, on the day of pick up, 65% of the balance, or $13,650, was due to the driver. Document 38-1 page 3 of 8. The Julsonnets had cash on hand in that amount the day of the pick-up to pay the driver. **Ex. E James Julsonnet Dep. 34:23-35:8; 97:14 to 100:20; Ex. F Diane Julsonnet Dep. 23:3-9.** The driver had agreed with Mr. Julsonnet that the cash would be paid after the truck was fully loaded. **James Julsonnet Dep. 34:23-35:8; Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** The first day of pick up ended without the goods being fully loaded on the Defendants' truck. The Defendants' agents said they would return the next day to finish loading, but they did not return. **Ex. F Diane Dep. 17:10-16; Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** The Julsonnets were ready, willing, and able to pay the second payment, but the Defendants never returned to finish loading and to receive that payment. **Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** The Defendants' statement that the payment had not been made and therefore the contract fails for lack of consideration is thus disputed.

The movers began to load their truck with the Julsonnets' goods without the Julsonnets signing any modification to the original contract. Under both federal law and the contract, any revised bill of lading must be executed before the moving company begins loading the truck, otherwise the original bill of lading, here **Document 38-1**, remains the binding contract. "If you have not signed the mover's revised estimate, and the mover loads the truck, the Federal

regulations requires that the mover has reaffirmed the original estimate and cannot demand additional payment at delivery for the additional items. 49 §375.403(a)(6); **Document 38-1, page 6 of 8. See also Document 31-8, page 5 of 8 "Revised Written Estimate" paragraph**.

Defendant Five Star began the move around 11 am. **Ex. F Diane Julsonnet Dep. at 16:18-20.** At the end of the day, Diane Julsonnet was ill. James took her to the hotel they had reserved because of the two-day move. **Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** As they pulled out of the driveway, they spoke with the Five Stars foreman telling them where they were going and that they would see them tomorrow to finish the move. **Ex. E James Julsonnet Dep. 77:10-21.** The Foreman said they would return on Sunday September 12, 2021. **Ex. F Diane Julsonnet Dep. 16:18-20; 17:10-16.** The Julsonnets returned to their house the next day to meet the movers. **Ex. F Diane Julsonnet Dep. 17:17 to 20:22.** Five Star never came back. **Ex. E James Julsonnet Dep. 95:15-18; Ex. F Diane Julsonnet Dep. 17:15-16.** Diane Julsonnet made numerous calls to Five Star, but no one answered the phone. **Ex. F Diane Julsonnet Dep. 17:15-16, 17:23 to 19: 1-13. James Julsonnet Dep. 87:1-8.** The Julsonnets rented a U-Haul to take the items that Five Star did not load and gave away a number of other items that they could not fit. They left for Colorado the next day on September 13, 2021, as planned. **Ex. F Diane Julsonnet Dep. 23:12-20.**

The Julsonnets did not hear from Five Star until September 14, 2021, or September 15, 2021. **Ex. E James Julsonnet Dep. 93:21-22; Ex. F Diane Julsonnet Dep. 24:3-25.** They were by then driving through Kansas. Defendant Escobar called them and told them they needed to come into the office in Massachusetts and sign the paperwork. **Ex. F Diane Julsonnet Dep. 25:1-13.** The Julsonnets told him they were on route to Colorado and could not drop in. **Ex. F**

**Diane Julsonnet Dep. 100:13-20.** They asked him to send any paperwork that needed to be signed. Five Star never sent any paperwork. **Ex. F Diane Julsonnet Dep. 102:14-17.**

Diane Julsonnet kept calling Febex and Five Star trying to speak to a live person. When they did contact someone, the representative informed them that their goods would not be delivered unless the Julsonnets paid twice what the binding estimate provided. **Ex. F Diane Julsonnet Dep. 29:8-10, 30:8-13.** The Julsonnets complained to the DOT and to local Massachusetts police. **Exs. A, B. C & D Interrogatory Answers 1.** The Julsonnets did not receive any paperwork from Five Star although they requested it. **Ex. F Diane Julsonnet Dep. 36: 3-10.** A local Massachusetts detective did obtain the paperwork from Five Star – which paperwork had Mr. Julsonnet's signature forged on the blank bill of lading that the Five Star foreman had attempted to have Mr. Julsonnet sign on September 11, 2021. **Ex. F Diane Julsonnet Dep. 36:13-37:16. Exs. C & D Diane Julsonnet Interrogatory Answer #1; Ex. E James Julsonnet Dep. 64:22 to 70:9., Ex. 18.**

Although Five Star did want the Julsonnets to have another mover pick up their goods, the pick-up was conditioned on their paying fees and costs not included in the binding estimate. **Exs. A & B James Julsonnet Interrogatory Answer #5.** When movers attempted to contact Five Star to arrange a pick-up, the movers' calls to Five Star went unanswered. **Ex. F Diane Julsonnet Dep. 17:23-18:6, 19:1-13; Ex. E James Julsonnet Dep. 108:5-11.**

The Julsonnets were finally able to retrieve their goods on January 10, 2024. **Ex. I James Julsonnet Aff. ¶ 5.** They hired another moving company that was able to load the Julsonnets' property in one truck load. **Ex. I James Julsonnet Aff. ¶ 5.**

5

## ARGUMENT

**Count I.** The Court denied Defendants' motion to dismiss Count I by order dated July 11, 2023. Count I is based on violations of the Federal Motor Carrier Safety Act and its regulations and is therefore not preempted by Carmack.

**Count II & III.** Counts II and III are also based on violations of federal law, the Racketeering and Corrupt Organizations Act, and are, therefore, not preempted by Carmack.

**Count IV.** Count IV was dismissed by prior order.

**The Plaintiffs' State Law Claims Are Not Preempted by the Carmack Amendment.**

The Julsonnets state law claims are not preempted by the Carmack Amendment.

The Carmack Amendment provides:

> A carrier providing transportation or service . . . shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . when transported under a through bill of lading . . .

49 U.S.C. § 14706(a)(1).

The Carmack Amendment also contains a savings clause, which limits its preemptive effect. That savings clause "preserves rights and remedies 'not inconsistent with the rules and regulations prescribed by the provisions of th[e] act.'" Smith v. United Parcel Serv., 296 F.3d 1244, 1247 (quoting Adams Express Co. v. Croninger, 226 U.S. 491, 507, 33 S. Ct. 148, 57 L. Ed. 314 (1913)).

The Carmack Amendment aims "to achieve national uniformity in the liability assigned to carriers" for lost or damaged goods. DaSilva v Border Transfer of MA, Inc., 377 F. Supp 3d 74, 89-90 (D. Mass. 2019) quoting Rini v. United Van Lines, Inc., 104 F.3d 502, 503-04 (1st Cir. 1997). It ensures that shippers do not shoulder "the burden of determining which of the several carriers handling interstate shipments bears the blame for loss or damage under diverse state laws," id. quoting N. Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc., 89 F.3d 452, 457 (7th Cir. 1996), and that "[c]arriers in turn acquire reasonable certainty in predicting potential liability," id. quoting Exel, Inc. v. S. Refrigerated Transp., Inc., 807 F.3d 140, 148 (6th Cir. 2015).

To this end, it preempts "all state laws that impose liability on carriers based on the loss or damage of shipped goods." DaSilva, supra at 89 quoting Rini, 104 F.3d at 506 (emphasis omitted). In other words, all states laws that "in any way enlarge the responsibility of the carrier for loss or at all affect the ground of recovery, or the measure of recovery," are preempted. Id. at 89, citing Rini at 505 (quoting Charleston & W.C. Ry. Co. v. Varnville Furniture Co., 237 U.S. 597, 603, 35 S. Ct. 715, 59 L. Ed. 1137 (1915)). The Carmack Amendment does not preempt liability for "an injury separate and apart from the loss or damage of goods." DaSilva at 89-90, quoting Rini at 506. The Carmack Amendment does not preempt Plaintiffs' claim for property damage deductions, which does not concern the loss of or damage to shipped goods and would not increase liability for damaged goods. DaSilva at 90-91.

To state a claim under the Carmack Amendment, "a plaintiff must show (1) delivery to the carrier in good condition; (2) arrival in damaged condition; and (3) the amount of damages caused by the loss." Skakov v. Black Bear Moving & Storage, 2022 U.S. Dist. LEXIS 222091, *6, (D. Mass. Dec. 9, 2022), quoting Camar Corp. v. Preston Trucking Co., Inc., 221 F.3d 271, 274 (1st Cir. 2000).

The preemption under the Carmack Amendment has limits. This District has recognized the limits of its preemptive scope:

> However, some lower courts—including the First Circuit—have recognized that such broad language can be misleading, and that the Carmack Amendment's preemptive effect is limited to "state laws that impose liability on carriers based on the loss or damage of shipped goods." Rini, 104 F.3d at 506; accord Gordon v. United Van Lines, Inc., 130 F.3d 282, 289 (7th Cir. 1997) ("[N]ot every claim even remotely associated with the transfer of goods from one place to another is necessarily a claim for damages to the shippers' goods."). Accordingly, "liability arising from separate harms—apart from the loss or damage of goods—is not preempted." Rini, 104 F.3d at 506; cf. Smith v. United Parcel Service, 296 F.3d 1244 (11th Cir. 2002) (state law claims preempted by Carmack unless based on "conduct separate and distinct from the delivery, loss of, or damage to goods"); Gordon, 130 F.3d at 290 (state law claims preempted except as to "conduct that is sufficiently distinct from the contract of carriage that a separate and independent claim arises"); N. Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc., 89 F.3d 452, 458 (7th Cir. 1996) (relevant question for Carmack Amendment preemption is whether there is a "separate and independently actionable harm to the shipper as distinct from the loss of, or damage to, the goods").

Clean Harbors Recycling Servs. Ctr. of Chi., LLC v. Harold Marcus Ltd, 2013 U.S. Dist. LEXIS 445703 *6-7 (D. Mass. March 29, 2013).

Here, Defendants never delivered the Julsonnet's goods. The Defendants never crossed state lines. The goods were never placed in interstate commerce. Rather, Defendants kept the Julsonnet's property in their warehouse in Massachusetts, holding it for ransom under the pretense of forged documents, seeking to extort twice the agreed upon cost from the Julsonnets before they would release their property. Carmack preemption applies to damage claims for lost or damaged goods that a mover picked up, moved, and unloaded. Here, Five Star picked up the goods but never delivered them. As other courts have found, holding goods for ransom falls outside the bounds of Carmack preemption:

8

> "[L]iability arising from separate harms -- apart from the loss of damage of goods -- is not preempted." Rini [v. United Van Lines, Inc., 104 F.3d 502] at 506 [(1st Cir. 1997)]; see also Gordon v. United Van Lines, Inc., 130 F.3d 282, 289 (7th Cir. 1997) ("[W]e too conclude that the Carmack Amendment does not preempt those state law claims that allege liability on a ground that is separate and distinct from the loss of, or the damage to, the goods that were shipped in interstate commerce."). The Plaintiff's allegations with respect to these counts concern acts of Green Planet that either pre-date or occurred after the transportation of property had terminated, and the resulting harm was not exclusively to the Plaintiff's personal belongings.

Fahrenbach v. Green Planet Movers, ___ F.3d __, 2023 US Dist. LEXIS 117659 (D. Mass. July 10, 2023) (Young, J.)

Here, the Julsonnet's claims are not based on damage to their goods during interstate transportation. Rather, they are based on the Defendants' willful and wrongful actions in using illegal and unfair practices including forging their names and holding their goods hostage in order to extract a price twice that of the binding estimate. Thus, like the civil conspiracy, abuse of process and malicious prosecution claims in Fahrenbach which survived preemption, the Julsonnets' state law claims for breach of contract, 93A, misrepresentation, breach of good faith and fair dealing, conversion survive here.

Courts facing similar conduct have determined that Carmack Amendment does not preempt claims based on the motor carrier's intentional misconduct in holding goods hostage or forging signatures.  Williams v. Quality Servs. Moving, 2020 US Dist. LEXIS 178831 at *7-9, 11-12, 14-15 (E. D. Wash. Aug. 5, 2020) (unfair and deceptive business practices are not preempted).

The Julsonnets negligence claim in Count XII  does relate to damaged goods.  Those goods, however, never left Massachusetts and have only recently been recovered by the

Julsonnets. Even the negligence claims survive the Carmack Amendment as the goods never left Massachusetts. Fahrenbach, supra (claims before the goods were delivered not preempted).

**The Defendants' Other Arguments Do Not Justify Summary Judgment.**

**Counts V and VI.** Counts V and VI allege breach of contract by Five Star. Defendants' argue the claim fails for lack of consideration. This is easily disposed of. The Julsonnets paid the deposit with the binding estimate. This provided adequate consideration for the contract to be enforced. Source One Fin. Corp. v. Progressive Direct Ins. Co., 2015 Mass. App. Div. 167 at * 5-6 (2015). Additional consideration was provided by the Julsonnets agreeing to utilize Defendants as their movers, thus foregoing other possible movers. Id. The Defendants confuse the lack of consideration with the alleged lack of performance. Whether consideration exists is determined at the time of contracting. Id. at *5 (explaining the difference between "failure of consideration" and failure of performance). See also Woods Hole Oceanographic Inst. V. ATS Specialized, Inc., 594 F. Supp 3d 276, 294 (D. Mass. 2022) (explaining contract formation).

What Defendants are really arguing is the alleged failure of the Julsonnets to perform by not paying the $13,600 that was due on pick-up. But this argument fails. The Julsonnets were ready, willing, and able to make that payment. They had cash on hand to make the payment. The Foreman agreed that the transfer of that cash would be made upon completion of loading the truck. **Diane Julsonnet Dep. 23: 3-9.** The movers, however, failed to return to complete loading of the Julsonnet's goods. Thus, the Julsonnets did not breach the contract by not making the second payment because the Defendants did not fulfill their condition of completing the loading of the truck.

**Count VII:** Count VII is for Conversion and Trespass. As noted above, Defendants never delivered the Julsonnet's goods. The Defendants never crossed state lines. Defendants kept the

10

Julsonnet's property in their warehouse in Massachusetts, holding it for ransom under the pretenses of forged documents, seeking to extort twice the agreed upon cost from the Julsonnets before they would release the property. Carmack preemption applies to damage claims for lost or damaged goods that a mover picked up, moved, and unloaded. Here, Five Star picked up the goods but never delivered them. Holding goods for ransom falls outside the bounds of Carmack preemption. Fahrenbach, supra.

**Count VIII.** Count VIII is based on the Massachusetts Consumer Protection Act (CPA). Contrary to the Defendants' argument, the Julsonnets claim fall under Section 11 not Section 9 of the CPA and thus the notice provision does not apply. Diane Julsonnet ran a business selling clothes over the internet. Her business inventory was contracted to be moved along with their household items. Section 11 applies when the parties are engaged in the conduct of trade or business, and no demand is required. Gargano & Assocs., P.C. v. John Swider & Assocs., 55 Mass. App. Ct. 256 (2002) (contract dispute regarding remodeling of law firm office was "grounded in business" and thus Section 11 applied, even though "remodeling" was not in the law firm's ordinary course of business); Kelley v. Riccelli Enter. of Mass., Inc., 2010 Mass. App. Div. 81 at *4-5 (2010) (citing Dahlborg v. Middleborough Trust Co., 16 Mass. App. Ct. 481, 485 (1983)), aff'd, 80 Mass. App. Ct. 1109 (2011). In Kelley, the defendant withheld payment to increase leverage, conduct similar to Five Star withholding delivery unless twice the contract price was paid. [C]onduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93 A purposes." Id. at *6-7.

Here, Diane Julsonnet's business inventory was contracted to be moved from her business location in Massachusetts to her new location in Colorado. Included in the items moved

were her and James' household items. Five Star is a commercial moving company. As in Gargano, "[a] contract to remodel [here to move] that property, therefore, concerns commercial property that is used for a business, and, presumably, the renovations [here the move of the inventory is] are an attempt to improve, at a minimum, the environment of that business [here, to move Diane Julsonnet's business inventory to Colorado]. Therefore, the nature of the transaction is grounded in business: a contract for remodeling and repairs of business office space. The parties involved were businesspeople, and Paul Gargano is an attorney and the owner of a law firm bearing his name." Gargano, at *13-14. Here Five Star is the moving business. Diane Julsonnet owns her on-line clothing business. The dispute thus falls under Section 11, and no notice is required.

**Count IX: Misrepresentation**. Plaintiffs misrepresentation claim is based on the misrepresentations made to him to induce him to enter into the contract. **Exs. A & B James Julsonnet Interrogatory Answers 1, 4, 8.** Febex misrepresented that they were movers when they were brokers, represented that the pricing in the estimate that Five Stars later attempted to rescind by forging a new bill of lading.

**Counts II & III Civil Rico**. Plaintiffs have demonstrated the requisites for their civil RICO claims. **Exs. A & B James Julsonnet Interrogatory Answers ## 1, 3, 4.** Five Stars owner Escobar testified that he and Five Stars had done business with Febex. **Ex. G Escobar Dep. 17:1 to 19:24; 28:15 to 29:23.**

**Count I: Motor Vehicle Safety Act.** Contrary to Defendants' argument, the Julsonnets have demonstrated injury to their goods, losing the use of those goods for years, having to replace them, and loss of over $100,000 in inventory and $40,000 in income due to the loss of Diane's business. Moreover, having held their property ransom until recently, the Julsonnets

have not had the ability to quantify the full extent of the damages to their household goods. **Exs. A & B 5, 6, 7, 8, 12.**

## CONCLUSION

Summary judgment should be denied. Plaintiffs state law claims are not preempted. Five Stars never delivered the goods, never crossed state lines, but engaged in unfair trade practices and violations of federal law in attempting to extort double the contract price for their services by holding hostage the Julsonnets' property. The Julsonnets' goods were not lost or damaged in transit – they never were delivered. Five Stars breached the agreement, forged documents, and deprived the Julsonnets of their property and peace of mind. A trial by jury should determine this case, not summary judgment.

WHEREFORE, Diane and James Julsonnet respectfully request that the court

A. Deny the Defendants' motion for summary judgment;

B. Hold a hearing on this motion; and

C. Grant any other relief the court deems equitable and just.

Dated: January 30, 2024

                                        Respectfully submitted,

                                        James and Diane Julsonnet

                                        By their Attorneys

                                        ROY S. McCANDLESS, ESQ., PLLC

                                        Roy S. McCandless Bar # 11850
                                        **McCandless Law Firm**
                                        Roy S. McCandless, Esq., PLLC
                                        125 North State Street
                                        Concord, New Hampshire 03301

Toll Free: 1-833-4-Roy-911
Direct: (603) 841-3671, Ext. 101
Law Firm: (866) 904-0587, Ext. 101
Facsimile: (603) 513-2799
(603) 731-9478 (mobile)
roysmccandless@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Objection to Motion to Motion for Summary Judgment was served on the parties on January 30, 2024, by the efiling system and by email.

_____
Roy S. McCandless