# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### C.A. NO. 1:22-cv-10767-RGS

### JAMES JULSONNET and DIANE JULSONNET
Plaintiffs
v.

### TOPHILLS, INC., *et al.*
Defendants.

## PLAINTIFFS' TRIAL MEMORANDUM REGARDING ISSUES OF DISPUTED LAW

NOW COME the Plaintiffs James and Diane Julsonnet, by and through counsel, and submit this trial memorandum pursuant to paragraph 7 of the Document #47, the Court's February 15, 2024 Order addressing foreseeable disputes on issues of law at trial..

### Facts

The Defendants violated federal law governing contracts for moving goods (see 49 CFR 375, Federal Motor Carrier Administration, § 375.403), and conducted a bait and switch regarding the terms of the moving contract with Plaintiffs, forged Plaintiffs' name on alleged revised contract documents, and then held their goods hostage under the pretense of the forged documents, demanding payment of monies twice the amount actually contracted for. Two and a half years later, the Julsonnets were finally allowed to retrieve their goods, paying another mover to do so, and having lost time, money, business opportunities due to the delay, and emotional distress due to the Defendants' illegal and outrageous conduct.

James Julsonnet entered into a binding estimate for Defendant movers to move Diane Julsonnet's business inventory and their household goods from Massachusetts to Colorado. **Exs. A & B James Julsonnet Interrogatory Answers # 12; Ex. C & D Diane Julsonnet Answers**

to Interrogatory 6. Diane's business consists of selling clothes and other personal items on the internet, with inventory obtained through buying out merchandise from other vendors. **Ex. F Diane Julsonnet Dep. 41:1 to 46:18.** Under Federal law and regulations, this binding estimate (Document 38-1) is the binding contract under which Defendants were obligated to move and deliver the Julsonnet's goods. 49 CFR § 375.403(a)(6)(ii), (7), (8).

Mrs. Julsonnet's business inventory and the Julsonnets' goods were valued at $142,800.00, as stated in the contract. Document 38-1 page 7 of 8. **Ex. I, James Julsonnet Aff. ¶ 4.** Diane testified that her inventory was valued at over $100,000, **Ex. F Diane Julsonnet Dep. 41:7 to 42:8,** and that her business had generated $40,000 a year. **Ex. F 46:5-18.** The price for the move was $26,998.61. James paid the 25% deposit of $5996.61, placing it on his credit card, leaving a balance of $21,000.00. The contract called for pick-up on September 12, and 13, 2021. The movers were to arrive on Sunday September 12, 2021. Document 38-1 page 2 of 8.

Instead of arriving on September 12, 2021, the movers called on Friday September 10, 2021, and stated they would begin the pickup one day early, on September 11, 2021. **Ex. E James Julsonnet Dep. 37:15-39:13; Ex. F Diane Julsonnet Dep. 6:19-25.** When the movers did arrive on September 11, 2021, it was Five Star Movers, and not Febex. **Ex. E James Julsonnet Dep. 54:15-18, 93:14-23; Ex. F Diane Julsonnet Dep. 15:1-5.** In addition, the Foreman for Five Star demanded that the Julsonnets sign a new bill of lading, mostly blank, before they started to load the truck. **Exs. A & B James Julsonnet Interrogatory Answer #3; Ex. F Diane Julsonnet Dep. 11:12 to 14:25.** The Julsonnets refused to sign a blank document. **Ex. E James Julsonnet Dep. 46:1-9, Ex. F Diane Julsonnet Dep. 11:18-22.** The movers also demanded that the Julsonnets agree to pay for boxes and other moving items. **Ex. F Diane Julsonnet Dep. 11:18-22, 12:10-14, 13:21-14:6.** The Julsonnets again refused, as they had been

boxing their materials. **Ex. F Diane Julsonnet Dep. 7:16 to 8:7.** Mr. Julsonnet did agree to pay

for any boxes they used, but on the condition that the movers get his approval for the use of the

boxes before they were used. **Ex. F Diane Julsonnet Dep. 13:13 to 14: 25.** The document was

signed by Mr. Julsonnet with that condition added. **Ex. E James Julsonnet Dep. 52:19-53:12.**

Under the contract's terms of payment, on the day of pick up, 65% of the balance, or

$13,650, was due to the driver. Document 38-1 page 3 of 8. The Julsonnets had cash on hand in

that amount the day of the pick-up to pay the driver. **Ex. E James Julsonnet Dep. 34:23-35:8;**

**97:14 to 100:20; Ex. F Diane Julsonnet Dep. 23:3-9.** The driver had agreed with Mr. Julsonnet

that the cash would be paid after the truck was fully loaded. **James Julsonnet Dep. 34:23-35:8;**

**Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** The first day of pick up ended

without the goods being fully loaded on the Defendants' truck. The Defendants' agents said they

would return the next day to finish loading, but they did not return. **Ex. F Diane Dep. 17:10-16;**

**Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** The Julsonnets were ready,

willing, and able to pay the second payment, but the Defendants never returned to finish loading

and to receive that payment. **Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** The

Defendants' statement that the payment had not been made and therefore the contract fails for

lack of consideration is thus disputed.

The movers began to load their truck with the Julsonnets' goods without the Julsonnets

signing any modification to the original contract. Under both federal law and the contract, any

revised bill of lading must be executed before the moving company begins loading the truck,

otherwise the original bill of lading, here **Document 38-1**, remains the binding contract. "If you

have not signed the mover's revised estimate, and the mover loads the truck, the Federal

regulations requires that the mover has reaffirmed the original estimate and cannot demand

additional payment at delivery for the additional items**. 49 §375.403(a)(6);  Document 38-1, page 6 of 8. See also Document 31-8, page 5 of 8 "Revised Written Estimate" paragraph**.

Defendant Five Star began the move around 11 am. **Ex. F Diane Julsonnet Dep. at 16:18-20.** At the end of the day, Diane Julsonnet was ill. James took her to the hotel they had reserved because of the two-day move. **Exs. A & B James Julsonnet Interrogatory Answers #1, 3.** As they pulled out of the driveway, they spoke with the Five Stars foreman telling them where they were going and that they would see them tomorrow to finish the move. **Ex. E James Julsonnet Dep. 77:10-21.** The Foreman said they would return on Sunday September 12, 2021. **Ex. F Diane Julsonnet Dep. 16:18-20; 17:10-16.** The Julsonnets returned to their house the next day to meet the movers. **Ex. F Diane Julsonnet Dep. 17:17 to 20:22.** Five Star never came back. **Ex. E James Julsonnet Dep. 95:15-18; Ex. F Diane Julsonnet Dep. 17:15-16.** Diane Julsonnet made numerous calls to Five Star, but no one answered the phone. **Ex. F Diane Julsonnet Dep. 17:15-16, 17:23 to 19: 1-13. James Julsonnet Dep. 87:1-8.** The Julsonnets rented a U-Haul to take the items that Five Star did not load and gave away a number of other items that they could not fit. They left for Colorado the next day on September 13, 2021, as planned. **Ex. F Diane Julsonnet Dep. 23:12-20.**

The Julsonnets did not hear from Five Star until September 14, 2021, or September 15, 2021. **Ex. E James Julsonnet Dep. 93:21-22; Ex. F Diane Julsonnet Dep. 24:3-25.** They were by then driving through Kansas. Defendant Escobar called them and told them they needed to come into the office in Massachusetts and sign the paperwork. **Ex. F Diane Julsonnet Dep. 25:1-13. T**he Julsonnets told him they were on route to Colorado and could not drop in. **Ex. F Diane Julsonnet Dep. 100:13-20.** They asked him to send any paperwork that needed to be signed. Five Star never sent any paperwork. **Ex. F Diane Julsonnet Dep. 102:14-17.**

Diane Julsonnet kept calling Febex and Five Star trying to speak to a live person. When they did contact someone, the representative informed them that their goods would not be delivered unless the Julsonnets paid twice what the binding estimate provided. **Ex. F Diane Julsonnet Dep. 29:8-10, 30:8-13.** The Julsonnets complained to the DOT and to local Massachusetts police. **Exs. A, B. C & D Interrogatory Answers 1.** The Julsonnets did not receive any paperwork from Five Star although they requested it. **Ex. F Diane Julsonnet Dep. 36: 3-10.** A local Massachusetts detective did obtain the paperwork from Five Star – which paperwork had Mr. Julsonnet's signature forged on the blank bill of lading that the Five Star foreman had attempted to have Mr. Julsonnet sign on September 11, 2021. **Ex. F Diane Julsonnet Dep. 36:13-37:16. Exs. C & D Diane Julsonnet Interrogatory Answer #1; Ex. E James Julsonnet Dep. 64:22 to 70:9., Ex. 18.**

Although Five Star did want the Julsonnets to have another mover pick up their goods, the pick-up was conditioned on their paying fees and costs not included in the binding estimate. **Exs. A & B James Julsonnet Interrogatory Answer #5.** When movers attempted to contact Five Star to arrange a pick-up, the movers' calls to Five Star went unanswered. **Ex. F Diane Julsonnet Dep. 17:23-18:6, 19:1-13; Ex. E James Julsonnet Dep. 108:5-11.**

The Julsonnets were finally able to retrieve their goods on January 10, 2024. **Ex. I James Julsonnet Aff. ¶ 5.** They hired another moving company that was able to load the Julsonnets' property in one truck load. **Ex. I James Julsonnet Aff. ¶ 5.**

## LEGAL AND EVIDENTIARY ISSUES

**I. Damages.**

The issue of damages under the Federal Motor Carrier Safety Act (FMCSA) and its regulations are at issue. The evidence will show that Tophills violations of the FMCSA nullify

any claim for damage liability. <u>Parkhurst v. United Parcel Serv.</u>, 1992 U.S. App. LEXIS 28583 (10th Cir. 1992).  As noted by the court in <u>Parkhurst,</u> "[a] carrier must meet four requirements in order to limit its liability: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his or her choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. <u>Norton v. Jim Phillips Horse Transp., Inc.</u>, 901 F.2d 821, 827 (10th Cir. 1989)." <u>Id.</u>at *9-10.  Unlike the case in <u>Parkhurst</u> where the shipper signed a bill of lading,  here Tophills issued no bill of lading or receipt to the Julsonnets before moving their goods and the binding estimate contains no waiver of the full replacement value of their goods.

## II.  Effect of FMSCA Violations.

Moreover, the effect of Tophills numerous FMCSA violations on its claims of limited liability and its material breach of its obligations must be addressed.  The FMCSA protects consumers from unscrupulous practices like last minute "bait & switch" tactics by requiring notice provisions, waiting provisions to contemplate last minute changes, and written agreements or modifications of binding estimates. See e.g., 49 CFR § 375.201, .203, .401 to .407, Subparts E, F and G and Plaintiffs' Proposed Jury Instructions. By violating those consumer protection provisions, Tophills cannot hide behind those same regulations to limit the Plaintiffs' damages.

Yet even if the Court were to find that the Julsonnets' damages were limited by the FMCSA, the limit would hold only up to the $142,800 noted in the Binding Estimate.  In <u>Southeastern Express Co. v. Pastime Amusement Co.</u>, 299 U.S. 28, 29 (1936), the Supreme Court permitted the claim for delay damages against the moving company, but limited the damages to the contracted for amount.  Here, the Binding Estimate contains no waiver of liability

to the tariff rate of sixty cents per pound and, thus, under federal regulations, Tophills liability must be up to the declared value of $142,800.  Cf. Williams v. Quality Servs. Moving, 2020 US Dist. LEXIS 178831 at *7-9, 11-12, 14-15 (E. D. Wash. Aug. 5, 2020).

These issues also affect the cross claim for storage fees asserted by Tophills.  The federal regulations address the notice requirements that a carrier must provide to a shipper if it intends to charge storage fees. 49 CFR §375.609.  Tophills failed to comply with those regulations and, thus, should not and cannot assert such a claim.  Cf. Parkhurst v. United Parcel Serv., 1992 U.S. App. LEXIS 28583 (10th Cir. 1992) (compliance with federal regulations required of motor carriers).

Dated:  March 18, 2024

Respectfully submitted,

James and Diane Julsonnet

By their Attorneys

ROY S. McCANDLESS, ESQ., PLLC

_____

Roy S. McCandless Bar # 11850
**McCandless Law Firm**
Roy S. McCandless, Esq., PLLC
125 North State Street
Concord, New Hampshire 03301
Toll Free:  1-833-4-Roy-911
Direct: (603) 841-3671, Ext. 101
Law Firm: (866) 904-0587, Ext. 101
Facsimile: (603) 513-2799
(603) 731-9478 (mobile)
roysmccandless@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Trial Memorandum was served on the parties on March 18, 2024, by the efiling system.

_____
Roy S. McCandless